HAROLD CHAKALES AND LINDA CAROL CHAKALES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chakales v. Commissioner
Docket No. 12155-84
United States Tax Court
T.C. Memo 1994-408; 1994 Tax Ct. Memo LEXIS 417; 68 T.C.M. (CCH) 479; August 22, 1994, Filed *417 Decision will be entered for respondent. For petitioners: Thomas E. Redding and Charles B. Koerth. For respondent: Lamont R. Olson. DAWSON
DAWSON
MEMORANDUM OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: By notice of deficiency dated February 7, 1984, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
1980
$ 82,104.24
$ 4,105.00
-0-
1981
56,214.00
-0-
$ 2,811.00
Respondent also determined that petitioners were *418 liable for an addition to tax in the amount of 50 percent of the interest due on the deficiency for the taxable year 1981 pursuant to section 6653(a)(2). In a First Amendment to Answer, respondent raised the issue whether the deficiencies for 1980 and 1981 were substantial underpayments due to tax-motivated transactions and whether the increased rate of interest under section 6621(c) was applicable. At the time the petition was timely filed petitioners resided in Little Rock, Arkansas. The issues presented for decision are: (1) Whether the increased interest provisions of section 6621(c) apply; and (2) whether petitioners are liable for additions to tax under section 6653(a). The facts may be summarized as follows. The deficiencies in this case result primarily from the disallowances of losses in the amounts of $ 205,714 and $ 210,390 claimed for the taxable years 1980 and 1981, respectively. The losses arise from alleged straddle transactions of forward contracts for Government-backed financial securities with First Western Government Securities, Inc. (First Western). The First Western losses were the subject of this Court's opinion in Freytag v. Commissioner, 89 T.C. 849 (1987), *419 affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991). After a lengthy trial, this Court found, based on that record, inter alia, that "The transactions between First Western and its customers were illusory and fictitious and not bona fide transactions." Id. at 875. This Court alternatively held that, even if the transactions had substance, they "were entered into primarily, if not solely, for tax-avoidance purposes." Id. at 876. Based on the finding that the transactions were not bona fide, this Court concluded that additional interest under section 6621(c) was due on the underpayments. Id. at 886-887. In concluding that the transactions were not bona fide, this Court examined various aspects of the First Western program, including the risk of profit or loss, the hedging operation, the margins required and fees charged, the pricing of the forward contracts that were involved, and the manner in which the transactions were closed. In all of these areas we found that the First Western operations were deficient *420 and not conducted as they should have been if bona fide financial transactions were being conducted. With respect to the losses, this Court noted: Petitioners' portfolios were constructed so as to achieve their desired tax losses. In this regard, the most important required data supplied by petitioners were their requested tax losses. Indeed, the program could not be implemented without the tax information. Thus, in analyzing the program from a profit standpoint, from the first, the tax tail wagged an economic dog. * * * [Id. at 878.]
We also pointed out that there were other "gremlins" in First Western's world that dispelled the notion that these transactions were bottomed in financial reality -- reversing transactions months later, confirmations being months late, transactions being made with no documentation, etc. Id. at 882. In the case currently before the Court, petitioners concede that the transactions with First Western were conducted in the same way as the transactions discussed in Freytag, i.e., the same pricing algorithms were used, the transactions were closed in the same way, etc. They *421 do not contest the disallowance of the losses claimed or the deficiencies arising therefrom. They do, however, contest the increased interest under section 6621(c) and the additions to tax for negligence under section 6653(a). Petitioner Harold Chakales (petitioner) is a surgeon. He has no background in economics and/or finance. Prior to 1980 he invested in stocks, bonds, options, and real estate in a "moderate" way. His investments had not been very successful. In early January 1980, petitioner was introduced to Charles Frederick Marshall (Marshall) by Wayne Coates (Coates), a vice-president of a local bank. Coates informed petitioner that Marshall had an investment opportunity "that might be worthwhile". Marshall met with petitioner and gave him First Western promotional materials. Marshall was a certified public accountant, but did not practice in that profession. In 1969, he went to Harvard Business School and since that time has been a broker, primarily marketing fixed-income securities to institutions. In 1979 Marshall was hired by Haas Securities (Haas) as a broker. Haas offered the First Western program to some of its customers. Marshall was told that some employees *422 of Haas had visited First Western and recommended that Haas brokers sell the program. The standard procedure was for a customer to send executed First Western documents to Haas and Haas would forward the documents to First Western. Marshall received commissions from First Western based on the alleged investments. Petitioner knew that Marshall received compensation from First Western and he did not pay any fees to Marshall. While Marshall indicated that he had made some investigation of the First Western program, he was unaware that First Western used an algorithm in setting its prices, that under the agreement First Western could set and change prices in its sole discretion, that the so-called "margin" was based on the requested tax preference, or that there was no market for First Western's contracts other than First Western. Some months after Marshall's initial contact, petitioner met with Marshall and George Plastiras (Plastiras). Plastiras is a tax lawyer who had done some corporate, pension, and estate planning work for petitioner. Marshall, Plastiras, and petitioner discussed the alleged tax aspects of the First Western program. After meeting with Marshall, Plastiras *423 took some of the First Western materials and discussed them with his partner, Walter Davidson (Davidson). Davidson worked in the securities law area. Davidson prepared an interoffice memorandum, based solely on his review of First Western's brochure, in which he noted that First Western operated "with little or no securities law regulations -- a subject now being criticized by the SEC". He also warned that "you should raise the very legitimate question of the reliability and integrity of these folks [First Western]." Although Plastiras relied on Davidson's memorandum in advising petitioner, he never contacted First Western and had no knowledge of how the First Western program worked or was supposed to work. Peitioner never advised Plastiras that he had requested a tax loss. Petitioner never furnished Plastiras with any of the documents that petitioner executed in the opening account with First Western. In giving advice that the First Western program was viable, Plastiras apparently only reviewed a tax opinion contained in the material supplied. While petitioner knew something about investment straddle and claimed to have read the First Western brochure, he was unaware that *424 First Western could set prices, that the prices were not published, or that the contracts were not traded on an open market. He did not know anything about "the internal workings of First Western" and he could not explain how a First Western portfolio would generate a profit. On May 7, 1980, petitioner executed the standard First Western documents and sent them to Marshall with a check in the amount of $ 26,000 payable to First Western. Marshall forwarded them to First Western. The First Western documents show that initially a $ 200,000 ordinary loss and a $ 200,000 long-term capital gain for 1980 were requested. The long-term capital gain was changed to a short-term capital gain in the same amount for 1980. For that year, First Western generated an alleged ordinary loss in the amount of $ 205,714, and a short-term capital gain in the amount of $ 200,557. On their 1980 Federal income tax return petitioners deducted the loss. The short-term capital gain was reported and used to partially offset a $ 331,711 short-term capital loss carryover. Although petitioner received wages in the amount of $ 300,000 from his professional association, no income taxes were withheld. Petitioners' *425 1980 Federal income tax return reported no tax liability. Because all the alleged gains and losses were realized in 1980, there were no forward contracts open. Nonetheless, First Western's records show that a Dolores Green from Haas called and changed the interest rate forecast on January 30, 1981. First Western took no action. On April 10, 1981, First Western's records show that Marshall called and requested a $ 200,000 ordinary loss for 1981 and a long-term capital gain in a similar amount for 1983. On April 13, 1981, First Western sent petitioner a letter requesting an additional "margin" in the amount of $ 12,748. This request was repeated by another letter dated August 24, 1981, and by telephone on September 9, 1981. Notwithstanding these requests, petitioner did not send a check to First Western until December 31, 1981. In this regard, while petitioner testified that he regularly monitored the First Western account and made changes in the interest rate forecast, there is no record of any communication with petitioner in First Western's records other than the requests for additional money. On their 1981 Federal income tax return, petitioners deducted an ordinary loss *426 in the amount of $ 210,390 from petitioner's First Western transactions. In addition, petitioner deducted $ 5,157 as "investment expense." He received wages in the amount of $ 400,000 from his professional association, and no income taxes were withheld. Petitioners' 1981 Federal income tax return showed no tax liability. 1. Section 6621(c)
Petitioners contend that the increased interest under section 6621(c) is inapplicable to them, relying on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. Section 6621(c)(1) provides that, if there is a "substantial underpayment attributable to tax motivated transactions," the interest payable under section 6601 "shall be 120 percent of the underpayment rate". A substantial underpayment attributable to a tax-motivated transaction means "any underpayment of taxes * * * attributable to 1 or more tax-motivated transactions if the amount of the underpayment for such year * * * exceeds $ 1,000." Sec. 6621(c)(2). The term "tax motivated transactions" means, inter alia, "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). From a literal reading *427 of the statute, if a transaction is determined to be a "sham", the increased interest applies. In Freytag v. Commissioner, 89 T.C. 849, 887 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991), we sustained respondent's determinations that section 6621(c) applied to the First Western underpayments based on our finding that the transactions were "shams." Because petitioner concedes that his transactions with First Western were identical to those in Freytag, additional interest under section 6621(c) is applicable here. See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991), affg. T.C. Memo. 1988-531. In Heasley v. Commissioner, T.C. Memo. 1988-408, this Court found that the transactions were not entered into for profit, and, therefore, under section 301.6621-2T Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), the increased interest under section 6621(c) was applicable. The Court of Appeals for the Fifth Circuit *428 concluded, however, that the taxpayers had "the requisite profit motive." Heasley v. Commissioner, 902 F.2d at 386. While it is true that in Freytag v. Commissioner, 89 T.C. at 882-886, we held, in the alternative, that the transactions were not entered into for profit, we sustained the additional interest under section 6621(c) on the ground that the alleged transactions factually were illusory and fictitious, i.e., "shams", a finding affirmed by the Court of Appeals for the Fifth Circuit 904 F.2d at 1015-1016, and it is upon that ground that we sustain respondent's determinations here. Petitioner, however, contends that for a transaction to be considered a sham under section 6621(c)(3)(A)(v), the transaction must be without economic substance and be entered into without a profit objective, citing Heasley v. Commissioner, supra. While, as discussed infra, we reject his contention that there was a profit motive, we neither read the Court of Appeals' opinion in Heasley nor its opinion in Lukens v. Commissioner, 945 F.2d 92, 99-100 (5th Cir. 1991), *429 affg. Ames v. Commissioner, T.C. Memo. 1990-87, to stand for this proposition. When a transaction is the simple product of smoke and mirrors, it is a factual sham, regardless of whether the taxpayer may have thought that a profit might have been made. See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). This is all that section 6621(c)(3)(A)(v) requires. See Statement of the Managers attached to the conference report, H. Conf. Rept. 99-841, at II-796 (1986), 1986-3 C.B. (Vol. 4) 1, 796. Thus, Heasley v. Commissioner, supra, is inapposite. 2. Negligence
Respondent determined that additions to tax under section 6653(a) are due for negligence. For the taxable year 1980, section 6653(a) provides, in relevant part, that "If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations * * * there shall be added to the tax an amount equal to 5 percent of the underpayment." For the taxable year 1981, section 6653(a) was amended, and the "5 percent of the underpayment" provision was redesignated as section 6653(a)(1). In addition, *430 section 6653(a)(2) provided an addition to tax in the amount of 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence. "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. at 887 (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964)); see also Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Petitioners have the burden of establishing that their actions were not negligent. See Freytag v. Commissioner, 904 F.2d at 1017. Petitioners contend that the additions to tax under section 6653(a) are unwarranted. The gravamens of their contentions are that petitioner relied on expert advice and that his motive for entering into the transactions was not to avoid taxes. With regard to petitioner's reliance on experts, such reliance, standing alone, will *431 not insulate a taxpayer from additions to tax for negligence. It must be shown that the expert had the expertise and knowledge of the pertinent facts to render such an opinion on the subject matter. Freytag v. Commissioner, 89 T.C. at 888. Furthermore, it must be established that the person rendering the advice is independent and does not have an economic interest in giving the advice. Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Petitioner's background is in medicine. He has no credentials in finance or economics. Prior to 1980, he made no investments in any transactions of the nature involved in this case, and he did not understand how the First Western program operated. Petitioner contends that he was entitled to rely on the advice of Marshall and Plastiras. Petitioner, however, did not hire Marshall to make an evaluation of First Western's program, and Marshall, as petitioner knew, was compensated by First Western for putting petitioner in the program. With respect to Plastiras, petitioner did not hire him to investigate First Western. Nor did petitioner investigate First Western. Indeed, when Davidson *432 raised concerns, these were not followed up, and Plastiras, like petitioner, simply relied on Marshall. When the chaff is stripped away, petitioner essentially relied on the promoter's statements concerning the bona fides of these transactions. Our words in Rybak v. Commissioner, supra at 565, explain the situation: In these circumstances, petitioners did not rely on competent, independent parties; they did no more than inquire of the promoter if the investment was sound. Such reliance is not the type of activity which will overcome the addition to tax for negligence or intentional disregard of the rules and regulations. [Citation omitted.]
See also Marine v. Commissioner, 92 T.C. 958, 992 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), *433 affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). It is noted that these transactions could hardly be described as being run-of-the-mill, and petitioner admits that he did not understand the transactions. They involved alleged forward contracts to purchase and sell millions of dollars of mortgage-backed securities. See Freytag v. Commissioner, 89 T.C. at 862-863. There was no market for these contracts, and First Western was on both sides of the transactions. In discussing the First Western transactions, the Court of Appeals for the Fifth Circuit noted: "'no reasonable investor would surrender total control of his or her ability to profit or lose unless satisfied that the risk of loss had been greatly diminished or eliminated.'" Freytag v. Commissioner, 904 F.2d at 1016 (quoting Sochin v. Commissioner, 843 F.2d 351, 356 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985)). Furthermore, the ratio of the tax losses compared with the payments was huge, between 8:1 and 16:1, depending on how it *434 is calculated. This latter fact was particularly important because, as the Court of Appeals for the Ninth Circuit recognized in Zmuda v. Commissioner, 731 F.2d at 1422, during this period there was "extensive continuing press coverage of questionable tax shelter plans." As we noted in our opinion in Freytag v. Commissioner, 89 T.C. at 888, given this scenario, a taxpayer could not merely rely on the documents supplied by First Western, and further investigation was clearly mandated. If there had been any serious examination of the program "'No reasonable person would have expected * * * [the] scheme to work.'" Id. at 889; cf. Hanson v. Commissioner, 696 F.2d 1232, 1234 (9th Cir. 1983), affg. per curiam T.C. Memo. 1981-675. Finally, we note that petitioner's alleged profit motive for the First Western transactions is simply cut from whole cloth. The raison d'etre of the program was to convert ordinary income into long-term capital gains and defer the payment of taxes. Petitioner was clearly aware of this. Petitioner, however, steadfastly *435 contends that he did not know about the request for tax losses that was supplied to First Western. This has a decidedly hollow ring. If we were to accept petitioner's argument, we would have to accept that the request for a tax loss, which was well tailored to his situation, materialized out of thin air. This would be particularly perverse because there were no taxes withheld from petitioner's substantial wage income, and we decline that invitation. It is highly unlikely that anyone whose primary purpose was to make a profit would enter into this transaction when he lacked any understanding of what was going on. Petitioner, however, had no difficulty in claiming losses based on the alleged transactions. We find it equally inconceivable that, if he had even a fleeting profit motive, he would not have paid some attention to his First Western account. Yet, despite petitioner's protestations to the contrary, there is no evidence in First Western's files that petitioner followed the account. Finally, petitioner does not explain how he expected to make an economic profit by requesting a loss in one year and a gain in the same amount in the same year (1980), or a loss in 1981 and *436 a gain in the same amount in 1983. The only rational explanation for any of this is that petitioner entered into these transactions with the primary, if not sole, objective of obtaining the tax loss. Petitioner, relying again on Heasley, suggests that he did all that was necessary because he was an "unsophisticated" investor. It is true that the Court of Appeals for the Fifth Circuit in Heasley found that "moderate-income" and "unsophisticated" investors were not negligent when they failed to independently investigate an investment in a tax shelter. Heasley v. Commissioner, 902 F.2d at 383-384. That, however, is not the case before us here. In this regard, we are continually surprised to discover, after Heasley, how the definition of an "unsophisticated" and "moderate-income" investor has been expanded to include well-educated persons who have established or been engaged in lucrative businesses and professions. Indeed, if petitioner fits within that description, it would appear that at least some of the taxpayers in Freytag were similarly situated. But in Freytag the additions to tax for negligence were affirmed by the same *437 court that had decided Heasley just a month before. Heasley does not shield petitioners from the additions to tax for negligence. Petitioners have not shown that they used due care, and respondent's determinations with respect to the additions to tax under section 6653(a) are sustained. To reflect petitioners' concession of the deficiencies and our conclusions on the disputed issues, Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩