_____

No. 95-1742
_____

Harold Chakales;                    *
Linda Carol Chakales,               *
          Appellants,               *
                                    *
     v.                             *     Appeal from the United States
                                    *     Tax Court.
Commissioner of Internal            *
Revenue,                            *
          Appellee.                 *          [PUBLISHED]

_____

Submitted: December 13, 1995

Filed:  March 27, 1996
_____

Before, BOWMAN and LOKEN, Circuit Judges, and SCHWARZER[*] District
     Judge.

_____

SCHWARZER, District Judge.

     Taxpayers Harold and Linda Carol Chakales ("Chakales") appeal

from a decision of the United States Tax Court upholding the

assessment of penalty interest by the Commissioner of Internal

Revenue.  <u>Harold Chakales and Linda Carol Chakales v. Commissioner</u>,

_____

     *The HONORABLE WILLIAM W SCHWARZER, Senior United States
     District Judge for the Northern District of California,
     sitting by designation.

68 T.C.M. (CCH) 479 (1994). We have jurisdiction under 26 U.S.C. § 7482(a) and affirm.

BACKGROUND

Chakales was among several thousand taxpayers who participated in a program operated by First Western Government Securities ("First Western") involving straddle transactions of forward contracts to buy and sell securities issued by the Government National Mortgage Association and the Federal Home Loan Mortgage Corporation. The Commissioner's disallowance of the participants' resulting tax losses on the ground that the program was a sham was upheld in Freytag v. Commissioner, 904 F.2d 1011, 1015-17 (5th Cir. 1990), aff'd on other grounds, 501 U.S. 868 (1991). As summarized by the Fifth Circuit in that case:

> First Western's absolute authority over the pricing and timing of the transactions that occurred in the self-contained market of its own making enabled it to achieve the tax losses desired by its investors with uncanny accuracy. The Tax Court's recognition that First Western's program made available to its investors an essentially risk-free opportunity to purchase tax deductions cannot be labeled clearly erroneous.

Id. at 1016 (citation omitted).

Chakales does not contest the disallowance of the losses, conceding that Freytag controls the treatment of his transactions. He contends, however, that the Tax Court erred in upholding the Commissioner's assessment of penalties. The Commissioner determined that Chakales was liable for a penalty under 26 U.S.C. § 6653(a) for negligent underpayment of the tax. In addition,

before the Tax Court, the Commissioner contended that an additional interest penalty was due under 26 U.S.C. § 6621(c) for a substantial underpayment of tax due to a tax-motivated transaction. The Tax Court upheld both assessments.

THE SECTION 6621(c) PENALTY

Section 6621(c) provides for an interest rate of 120 percent on any "substantial underpayment attributable to any tax motivated transactions" (i.e., in excess of $1,000), and states in relevant part: "[T]he term 'tax motivated transaction' means . . . any sham or fraudulent transaction." 26 U.S.C. § 6621(c)(3)(A)(v). The Tax Court, basing its determination on the Fifth Circuit's holding in <u>Freytag</u> that these transactions were shams, sustained the assessment of the penalty.[1] 68 T.C.M. at 482. It rejected Chakales's argument that the penalty cannot be assessed in the absence of a finding that the taxpayer lacked a profit motive. It went on, however, to find that Chakales in fact lacked a profit motive.

We review the Tax Court's legal conclusions de novo but accept its findings of fact unless clearly erroneous. <u>Chase v. Commissioner</u>, 926 F.2d 737, 740 (8th Cir. 1991). "'A finding is "clearly erroneous" when although there is evidence to support it,

---

[1]The Commissioner assessed section 6621(c) penalty interest in <u>Freytag</u>. The Tax Court upheld the assessment on the ground that the transactions were a sham. <u>Freytag v. Commissioner</u>, 89 T.C. 849, 886-87 (1987). The court of appeals did not address the issue in its opinion.

the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

Under the plain language of the statute, a tax motivated transaction "means . . . [inter alia] *any* sham . . . transaction." 26 U.S.C. § 6621(c)(3)(A)(v)(emphasis added). The Commissioner has authority, therefore, to assess the penalty simply upon a finding that a transaction was a sham. See Howard v. Commissioner, 931 F.2d 578, 582 (9th Cir. 1991) (affirming a penalty under section 6621(c)(3)(A)(v) where the Tax Court found the underlying transaction "to be a sham."). Chakales contends that the taxpayer's state of mind is always relevant in the determination of whether a transaction was tax motivated. He relies principally on Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990). However, Heasley did not arise under the "sham transaction" provision of section 6621. In that case the penalty was assessed under the catch-all provision of section 6621(c)(3)(B) and an IRS regulation defining a "tax motivated" transaction as one "not engaged in for profit." Id. at 385; 26 C.F.R. § 301.6621-2T, Q-4, A-4 (2). Heasley had invested -- and lost -- a substantial sum in a scheme represented by his investment adviser as expected to produce future profits. The court of appeals held that the tax court had erred in solely considering that the plan had generated only tax deductions and credits but no profits. It held that "the tax court also should have considered the Heasleys' intent when determining whether the Heasleys did not engage in the transaction for profit." Id. at 386. Heasley, therefore, does not address the issue in this

-4-

case nor do the other decisions cited by Chakales. Section 6621(c)(3)(A)(v) by its terms authorizes the assessment of a penalty against a taxpayer participating in any sham transaction. Chakales does not dispute the Commissioner's disallowance of the losses based on the characterization of the transactions as sham. There is no basis for reading a separate state of mind requirement into the application of the sham test for purposes of section 6621(c)(3)(A)(v).

Chakales argues further that "[b]ecause this penalty applies at the investor level, that is the place to examine the 'motivation.' A defrauded investor is not subject to a penalty because he was unsophisticated enough to be victimized." Appellant's Brief at 47. We need not decide the appropriate application of section 6621(c)(3)(A)(v) to the case of an innocent victim of a fraudulent scheme who entered it in good faith for profit. This is not such a case. The Tax Court made specific findings rejecting Chakales' assertion of a profit motive. It found that he was aware of "[t]he raison d'etre of the program . . . to convert ordinary income into long-term capital gains and defer the payment of taxes." 68 T.C.M. at 483. It found that Chakales had no understanding of the transactions, that he did not follow his account with First Western but submitted a request for a tax loss to First Western and had no taxes withheld from his substantial income from wages,[2] and that he could not explain how

---

[2] Chakales' explanation for the lack of withholding on his annual wages in the two years at issue ($300,000 and $400,000, respectively) was that "[h]e borrowed from his firm throughout the year and bonused an appropriate amount at year end, basing his withholding on December 30 or December 31 on the totality of facts then known." Appellant's Brief at 37.

he expected to make a profit by requesting a loss in one year and an offsetting gain in the next. After reviewing Chakales' course of conduct with respect to his investment, the court found that "[t]he only rational explanation for any of this is that petitioner entered into these transactions with the primary, if not sole, objective of obtaining the tax loss." Id. at 484. That finding is not clearly erroneous. See Lukens v. Commissioner, 945 F.2d 92, 99-100 (5th Cir. 1991).

THE SECTION 6653 PENALTY

Section 6653 provides that "[i]f any part of any underpayment . . . is due to negligence . . . there shall be added to the tax an amount equal to 5 percent of the underpayment."[3] 26 U.S.C. § 6653(a)(1). "[T]he determination of a negligence penalty is presumptively correct, and the taxpayer bears the burden of proving that it was improperly imposed." Chase, 926 F.2d at 740; see also Freytag, 904 F.2d at 1017. Thus the burden is on the taxpayer to prove that he did not fail to exercise due care or do what a reasonable and prudent person would do under similar circumstances. Goldman v. Commissioner, 39 F.3d 402, 407 (2nd Cir. 1994). "In addition, because the tax court's decision involved a factual determination, it will not be disturbed on appeal unless clearly

---

[3]For the taxable year 1981, section 6653(a)(2) provided an addition to tax in the amount of 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

erroneous."  Chase, 926 F.2d at 740.

The Tax Court found Chakales to have admitted that he did not understand these transactions which involved forward contracts to purchase and sell millions of dollars of securities, with ratios of tax losses to payments from 8:1 to 16:1.  68 T.C.M. at 483.  Given these facts, Chakales "could not merely rely on the documents supplied by First Western, and further investigation was clearly mandated.  If there had been any serious examination of the program '[n]o reasonable person would have expected * * * [the] scheme to work.'"  68 T.C.M. at 483 (quoting Freytag, 89 T.C. at 889)(internal quotation omitted).

Chakales contends, however, that he reasonably relied on the advice of experts, to wit, Charles Frederick Marshall and George Plastiras.  Marshall was a broker employed by a securities firm. He introduced Chakales to the First Western program, presenting him with the documents which Chakales later completed and sent to First Western.  Chakales knew that Marshall received a commission from First Western for selling the program to him.  With respect to Marshall, the Tax Court held that reliance on "the promoter's statements concerning the bona fides of these transactions . . . 'is not the type of activity which will overcome the addition to tax for negligence.'"  68 T.C.M. at 483 (quoting Rybak v. Commissioner, 91 T.C. 524, 565 (1988)).  See Goldman, 39 F.3d at 408 (reliance on advice from person who signed the limited partnership agreement at issue as the partnership's sales representative was unreasonable).

Plastiras was an experienced tax attorney and accountant who had represented Chakales since 1964 in various business and estate matters, including their tax aspects. At Chakales' request, Plastiras met with him and Marshall late one afternoon to discuss the First Western program, including the risks involved and whether it had economic reality. He testified that he received First Western's materials, had lawyers in his firm research them and arrive at their own opinion, and received from one of his partners a hand-written office memorandum respecting the securities aspect of the investment. Plastiras made no investigation of First Western; as he put it, "I am just totally unaware about First Western. Forgive me."

Chakales' testimony described the advice he received from Plastiras as follows:

> Q. [D]id you retain his firm to render those opinions or that advice?
> A.  Yes.
> Q.  And what did he tell you the advice of his firm was?
> A.  That it sounded like this was a very legitimate firm, and that there was an opportunity to make some money.
> Q.  And what did he tell you about the tax opinion that [Marshall gave to you]? . . .
> A.  He thought that the tax opinion from Arthur Andersen was reasonable.
> Q.  The tax opinion from Arthur Andersen?
> A.  Well, whatever it was. I am not sure. That he thought that this was a reasonable investment, as a taxpayer.

Q. Did he give you an opinion about the tax treatment of the transactions?

A. What do you mean by tax -- an opinion as to tax treatment?

Q. You gave him three documents . . .

A. One was . . . a legal opinion from a law firm.

Q. What was the legal opinion from the law firm about?

A. Maybe that was the tax - - that was about the securities, I thought. I may be a little confused.

Q. And what did he tell you about that legal opinion from the law firm?

A. That he didn't know the law firm, and that his law firm looked over it and thought that it was reasonable . . . [and that it] [c]oncurred with their opinion.

(Joint Appendix 182-84.)


The relevant testimony of Plastiras was as follows:


Q. And what did you advise him or did you give him any advice as to whether or not this transaction had economic substance in reality? . . .

A. Yes. In our judgment, it had economic risk, and that he could lose considerable amount of money. I was very much concerned more about the loss of money than the gain. I didn't want him to lose any money.

(Joint Appendix 161-62.)[4]

The Tax Court found that Chakales did not hire Plastiras to investigate First Western, that when Plastiras' partner raised concerns they were not followed up, and that Plastiras, like Chakales, simply relied on Marshall. 68 T.C.M. at 483.

In <u>United States v. Boyle</u>, 469 U.S. 241, 251 (1985), the Supreme Court laid down the controlling principle:

> When an accountant or attorney <u>advises</u> a taxpayer on a matter of tax law, . . . it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.

The underlying premise is that a taxpayer may reasonably rely on advice when that advice involves the application of the attorney's or accountant's relevant expertise. That is not what occurred in this case. The "advice" Plastiras gave, on which Chakales now claims to have relied, was little more than a generalized statement that he could lose money on the transaction. Chakales himself was vague at best about just what "advice" he had received from Plastiras. <u>See</u> <u>Howard</u>, 931 F.2d at 582 ("Where no reliable evidence exists in the record suggesting the nature of any advice

---

[4]Plastiras did not prepare Chakales' tax returns, and there is no evidence that Chakales received or relied on advice from his tax accountants in claiming the disallowed losses.

given, a finding of negligence is not erroneous."). There is, moreover, no evidence that Plastiras researched the tax aspects of the transaction, much less that he investigated First Western or the manner in which the program operated. <u>See</u> <u>Leonhart v. Commissioner</u>, 414 F.2d 749, 750 (4th Cir. 1969)("[T]o escape the penalty [on the ground of good faith reliance on the advice of an accountant] taxpayers must be able to show that the accountant reached his decisions independently after being fully apprised of the circumstances of the transactions.") <u>Cf.</u> <u>Chamberlain v. Commissioner</u>, 66 F.3d 729, 733 (5th Cir. 1995)(reversing penalty assessment where "[t]he [tax] expert advised that there was 'a good faith, supportable position' concerning the deductibility of the loss."), <u>reh'g denied</u>.

The Tax Court's factual findings are not clearly erroneous and its conclusion that Chakales failed to carry his burden of proving that he exercised due care was not error.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-