T.C. Memo. 1997-86

UNITED STATES TAX COURT

JOE E. HENRY AND CAROLYN J. HENRY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4347-89.                        Filed February 19, 1997.

<u>Andrew M. Wolov</u>, for petitioners.

<u>David G. Hendricks</u> and <u>Osmun R. Latrobe</u>, for respondent.

MEMORANDUM OPINION

DAWSON, <u>Judge</u>:  This case was assigned to Special Trial
Judge Lewis R. Carluzzo pursuant to section 7443A(b)(4) and Rules
180, 181, and 183.  All section references are to the Internal
Revenue Code in effect for the years in issue.  All Rule

references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

CARLUZZO, Special Trial Judge:  Respondent determined deficiencies and additions to tax in petitioners' 1979, 1980, 1981, and 1982 Federal income taxes as follows:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1979 | $15,738.00 | $ 786.90 | --- | --- | $ 4,721.40 |
| 1980 | 22,950.00 | 1,147.50 | --- | --- | 6,885.00 |
| 1981 | 12,645.00 | --- | $ 632.25 | 1 | 3,793.50 |
| 1982 | 53,453.70 | --- | 2,672.69 | 1 | 16,036.11 |

1 50 percent of the interest due on the deficiency.

In addition, respondent determined that interest accruing after December 31, 1984, on the deficiency for each year would be calculated in accordance with section 6621(c).

This case is part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).

Consistent with the resolution of some of the disputed issues in Provizer, the parties filed a Stipulation of Settled Issues concerning the adjustments related to petitioners' participation in the Plastics Recycling Program.  The stipulation provides:

1.  Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns for the taxable years in issue as a result of their participation in the Plastics Recycling Program.

2.  The petitioners are liable for the additions to tax pursuant to I.R.C. section 6659 as set forth in the notice of deficiency.

3.  The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. section 6621(c) as set forth in the notice of deficiency.

The issue remaining for decision is whether petitioners are liable for the additions to tax for negligence under section 6653(a) for 1979 and 1980 and under section 6653(a)(1) and (2) for 1981 and 1982.

Background

Some of the facts have been stipulated, and they are so found.  At the time of the filing of the petition, petitioners resided in Tulsa, Oklahoma.  References to petitioner are to Joe E. Henry.

The details of petitioner's educational background have not been provided.  He attended college for at least 1 year and took some accounting courses.  He also took various seminars and courses relating to his profession at unspecified locations and times.  As of the date of trial, petitioner had been employed in various capacities in manufacturing industries for over 40 years. In the 1970's he was employed as the general manager of several

manufacturing companies and during this period petitioner became familiar with plastic injection molding machines. In 1975, petitioner was hired by Ramsey Winch Co. (Ramsey) as the vice president of operations. At Ramsey, petitioner acquired expertise in manufacturing winches. He negotiated Ramsey's acquisition of the Auto Frame Co., and thereafter was employed as president of both companies. Petitioner continued his employment with Ramsey at least through the date of trial.

Neither the educational nor employment histories of Carolyn J. Henry have been placed in the record. The parties stipulated that she was a "housewife" during 1982.

Petitioners' Federal income tax returns for the years in issue and presumably the relevant Forms 1045 were prepared by William L. Storey (Storey). Petitioners have been clients of Storey, who was a certified public accountant, since the late 1960's. Storey received a bachelor of science degree in Business Administration with a major in accounting from the University of Arkansas. Storey retired in 1989 after practicing as a certified public accountant for 35 years. While in practice, Storey provided general financial advice to his clients and specialized in the preparation of Federal income tax returns and financial statements.

Between 1970 and 1986, Storey occasionally reviewed tax shelter investments for his clients. In the fall of 1981, Storey learned about the Sunbelt Group partnership (Sunbelt) after

contacting Samuel Winer (Winer) in connection with a matter involving a client.  Sunbelt is a limited partnership which purportedly engaged in licensing Sentinel expanded polyethylene (EPE) recyclers manufactured by Packaging Industries of Hyannis, Massachusetts (PI).  Winer was an investment banker and financial consultant with offices in Clearwater, Florida.  During his conversation with Winer, Storey became interested in investing in Sunbelt and asked Winer to send him an offering memorandum. Aside from being the general partner of Sunbelt, Winer was also an investor in the project and the general partner in a number of other plastics recycling limited partnerships including Clearwater, Poly Reclamation Associates, Southeast Recovery Associates, and Esplanade Associates.  For his services to Sunbelt, Winer received $60,000 out of the proceeds of the Sunbelt private offering.

After receiving the offering memorandum,[1] Storey read it thoroughly twice and read portions of it five times.  He considered the offering memorandum to be well prepared, at least as compared to others that he had read.  Storey was skeptical of representations made in the offering memorandum regarding cash flow, revenue projections, and tax benefits.  He contacted John Taggart (Taggart) and Elliot Miller (Miller) regarding the tax

---

[1]     The offering memorandum for Sunbelt was not made a part of the record.  Instead, the parties stipulated to the offering memorandum for Clearwater.  We assume that the offering memoranda for Sunbelt and Clearwater are substantially identical.

benefits; however, the substance of these conversations is not disclosed in the record. Taggart and other members of the law firm of Windels, Marx, Davies and Ives prepared the offering memorandum, tax opinion, and other legal documents for the initial Plastics Recycling partnership, Clearwater, and 16 other Plastics Recycling partnerships, including Sunbelt. Taggart was the head of the tax department of Windels, Marx, Davies and Ives and taught tax law as an adjunct professor at New York University (NYU) Law School. Taggart had previously been employed by the U.S. Treasury Department and as a full-time faculty member of NYU Law School. Taggart owned a 6.66-percent interest in a second-tier Plastics Recycling partnership. Miller was a practicing attorney who specialized in tax matters. Miller was employed as corporate counsel to PI for 29 years and at all times relevant to this case. Storey tentatively decided to invest in Sunbelt for various reasons, including its "attractive" tax benefits.

In December 1981, Storey went to Hyannis, Massachusetts, to visit PI's facilities. While in Hyannis, Storey spent 7 hours at PI where he toured PI's facilities and observed a demonstration of a recycler. While at PI's facilities, Storey observed the presence of security officers and the use of personnel name tags.

During this visit, Storey met John D. Bambara (Bambara) and Anthony Giovannone (Giovannone). Bambara is the president of PI and member of its board of directors. Bambara is also the president, treasurer, clerk, and director of FMEC Corp., as well

as 100-percent owner of its stock. Giovannone is executive vice president of PI and a member of its board of directors. Giovannone and Bambara advised Storey that the recycler was unique because no other machine on the market could recycle plastic. To support their statements, they referred Storey to the marketing report of Stanley Ulanoff, a marketing consultant with an interest in two recycling partnerships. The marketing report was appended to the offering memorandum.

When Storey questioned Bambara about the price of the recycler, Bambara stated that the recycler was unique and that, if he were to sell the recycler, he would not sell it for less than the price in the offering memorandum. However, Storey was still skeptical about its cost because in his words:

> I am not an engineer and it is hard for me to say what it cost to produce something like that and I couldn't see the inside of the machine. But I -- it just didn't look like the cost to produce one would be anything like the price that was put on them but the value of it is not the cost to produce it.
>
> I was somewhat at a loss regarding this. * * *

In December 1981, Storey went to Clearwater, Florida, to meet Winer. Storey and Winer discussed Sunbelt; however, the substance of any conversation between them is unknown. In October 1982, Storey traveled to Hyannis with Bill Stewart (Stewart) to observe a demonstration of another recycler. During this trip, Storey and Stewart agreed to split the commissions

related to Stewart's clients who subsequently invested in Sunbelt.

Storey considered contacting an independent engineer for advice regarding the recycler, but he did not know how or where to locate someone knowledgeable in plastics. Despite his visits to Hyannis and review of the offering memorandum, Storey did not know the names of specific companies that would lease the recyclers, whether the use of the recycler would be profitable for any company, or the operating history of the recycler.

Storey spent about 100 hours on an "investigation" of Sunbelt. He kept track of the time he devoted to this "investigation" through the use of time sheets and memoranda regarding his telephone conversations. Storey billed the time directly related to petitioner's investment in Sunbelt to petitioner at one rate, and Storey allocated a portion of the other time, which was general in nature with respect to the investment, to petitioner at a different rate. Storey believed he would recoup the expenses related to his "investigation" through commissions from Sunbelt and the fees he charged clients.

Storey recommended Sunbelt to at least five of his clients including petitioners. For each investment, Storey was entitled to receive, and on some occasions did receive, a commission of 10 percent of their investment. Although Storey was entitled to receive a commission of $5,000 related to petitioners' investment

in Sunbelt, he instructed Winer to pay the commission to petitioners.

When he recommended Sunbelt to petitioner, Storey advised petitioner that he was planning to invest in Sunbelt, described his "investigation" into Sunbelt, and provided him with the offering memorandum for Sunbelt. Storey also advised petitioner to read the offering memorandum to determine for himself whether an investment in Sunbelt would result in an economic return. Petitioner thoroughly reviewed the offering memorandum. During this review, petitioner noticed that the offering memorandum advised the potential investor to closely review the offering memorandum to be satisfied as to the feasibility of the investment and that the investment would generate the advertised tax credits.

The offering memorandum allocates 10 percent of the proceeds from each offering to the payment of sales commissions and offeree representative fees. In addition, the offering memorandum lists significant business and tax risks associated with an investment in Sunbelt including: (1) A substantial likelihood of an audit by the Internal Revenue Service (IRS) and that the purchase price paid by F&G Corp. to ECI Corp. would probably be challenged as being in excess of fair market value; (2) that Sunbelt had no prior operating history; (3) that Winer had no prior experience in marketing, recycling, or similar equipment; (4) that the limited partners had no control over the

conduct of Sunbelt's business; (5) that there was no established market for the recyclers; (6) that there were no assurances that market prices for virgin resin would remain at their current costs per pound or that the recycled pellets would be as marketable as virgin pellets; and (7) that certain potential conflicts of interest existed.

Because petitioner was surprised at the price of the recycler, petitioner and Storey discussed its value in relation to Ulanoff's marketing opinion in the offering memorandum. Because petitioner was also surprised at the tax benefits, he and Storey discussed the kind and amount of deductions generated by an investment in Sunbelt. During these discussions, petitioner did not ask Storey to seek an expert opinion regarding the value of the recycler. Petitioner never inquired about specific details of the operation of the recyclers or the viability of the recycler to end-users. Petitioners knew that Storey did not have a background in plastics, but did not personally investigate Sunbelt or PI.

During 1982, petitioners invested $50,000 in Sunbelt and in return acquired a 6.19-percent limited partnership interest in Sunbelt. On their 1982 Federal income tax return, petitioners claimed a loss of $40,073 related to their investment in Sunbelt. Petitioners also claimed an investment tax credit of $44,211 and a business energy investment tax credit of $43,181. Petitioners used $34,447 of these credits in 1982 and carried back unused

credits to 1979, 1980, and 1981 in the amounts of $15,738, $22,950, and $12,645, respectively.

In the notice of deficiency, respondent disallowed all items of income, loss, deductions, and credits related to Sunbelt, and increased petitioners' income accordingly for 1982. Respondent also disallowed the investment tax credit carry backs for 1979, 1980, and 1981, and allowed an investment tax credit of $1,230 for 1982. In addition, respondent determined that, for each year, petitioners were liable for the additions to tax under section 6653 for negligence, section 6659 for valuation overstatement, and section 6621(c) for increased interest. As previously noted, petitioners now dispute only respondent's determinations relating to the imposition of the addition to tax for negligence.

Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177, with the exception of certain facts concerning the Provizers, the expert opinions, and other matters that we consider of minimal significance. Those facts may be summarized as follows. In 1981, PI manufactured and sold six Sentinel EPE Recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F&G Corp. for $1,162,666 each. F&G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were

financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F&G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was due only after the nonrecourse portion was paid in full. The fair market value of a Sentinel EPE Recycler in 1981 was not in excess of $50,000, and the nuts and bolts, or manufacturing cost, was $18,000. Other recycling machines were commercially available during the years in issue including the Buss-Condux Plastcompactor, Nelmor/Weiss Densification System (Regenolux), Cumberland Granulators, and Foremost Densilator. Information regarding these other machines was readily available. PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, Sunbelt leased Sentinel EPE Recyclers from F&G Corp. and, as prearranged, licensed those recyclers to FMEC Corp. The significant transactions of Sunbelt differ from the underlying transactions in Provizer v. Commissioner, supra, only in the following respects: (1) The entity that leased the machines from F&G Corp. and licensed them to FMEC Corp; and (2) the number of machines sold, leased, licensed, and sublicensed.

In Provizer, a test case for the Plastics Recycling group of cases, this Court found that each Sentinel EPE recycler had a fair market value not in excess of $50,000; (2) held that the transaction, which is almost identical to the transactions in this case, was a sham because it lacked economic substance and a business purpose; (3) upheld the sections 6653(a)(1) and (2) additions to tax for negligence; (4) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers; and (5) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

The value of the Sentinel recyclers was misrepresented in Sunbelt's promotional materials. Petitioners never took any legal action against anyone connected with Sunbelt or PI. Petitioners never took any legal action against Storey in connection with the recommendations or advice he provided to them regarding Sunbelt.

Discussion

Section 6653(a) for 1979 and 1980 and section 6653(a)(1) for 1981 and 1982 impose an addition to tax equal to 5 percent of the

underpayment if any part of any underpayment in tax is due to negligence or disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or disregard of rules or regulations. Petitioners bear the burden of proof to show that any underpayment was not due to negligence. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

We have decided numerous Plastics Recycling cases and, to date, have found the taxpayers liable for such additions to tax in all but one of the opinions. See Friedman v. Commissioner, T.C. Memo. 1996-558 and cases cited therein.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his or her experience and the nature of the investment or business. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare Spears v. Commissioner, T.C. Memo. 1996-341 with Zidanich v. Commissioner, T.C. Memo. 1995-382.

Petitioners contend that they were not negligent because they reasonably relied in good faith upon the advice of a qualified, independent adviser, to whom they made full disclosure.  In addition, petitioners contend that they were not negligent because they reasonably expected to make a profit from their investment in Sunbelt.  Respondent, on the other hand, contends that petitioners were negligent because their reliance on Storey was not reasonable and they failed to investigate the investment.

Under some circumstances a taxpayer may avoid liability for the additions to tax under sections 6653(a)(1) and (2) if reasonable reliance on a competent professional adviser is shown. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  Goldman v. Commissioner, supra; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991).  Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture.  Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985).

The offering memorandum contains a description of various business and tax risks associated with an investment in Sunbelt. Despite a review of the offering memorandum and skepticism of its contents, Storey made no effort to verify the information in the offering memorandum beyond visiting PI's facilities and contacting Miller, Bambara, Taggart, Giovannone, and Winer, all of whom are insiders and promoters associated with Sunbelt. Despite his lack of knowledge regarding the recycler, the target market for the recycler, and the technical aspects of the transactions, Storey did not contact an expert in plastics recycling or engineering or recommend that petitioner do so.

Although Storey visited the PI plant in Hyannis, toured the facility, and observed a demonstration of the recycler, he was not qualified to analyze or assess the machines on display or the

facility. Storey made no adequate investigation into the value of the recycler, although, an investigation would have revealed the existence of other plastics recycling machines available in 1981 and 1982 ranging in price from $20,000 to $200,000. See Provizer v. Commissioner, T.C. Memo. 1992-177. Despite his lack of special qualifications and professional skills in plastics engineering, recycling, or materials, Storey made no effort to contact or consult with anyone who possessed such qualifications. Given Storey's background and experience, he undoubtedly was aware that the tax benefits outlined in the offering memorandum and claimed by petitioners depended in large part on the value of the recycling machines. Nevertheless, having no knowledge or background regarding the value of the machines, he did nothing sufficient to verify the representations made in the promotional materials and by individuals associated with the promotion. As we view the matter, Storey's trips to inspect the machine and the other aspects of this "investigation" were essentially superficial. In effect, he relied not upon the information he gathered through his own investigation, but upon representations made by Sunbelt's promotional materials and promoters.

Taking the above into consideration, petitioners' reliance upon Storey was not reasonable. A taxpayer may rely upon his adviser's expertise, in this case financial planning and tax advice, but it is not reasonable to rely upon an adviser regarding matters outside his field of expertise or with respect

to facts which he does not verify, in this case the value of the recycler.  Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987).

Moreover, Storey was not an independent adviser since he was entitled to receive compensation from Sunbelt for petitioners' investment.  Although Storey refunded the commission to petitioners, because he was paid to sell the investment, his advice was suspect.

Petitioners contend that they read the offering memorandum and questioned Storey regarding its contents.  The extent of petitioners' review of the offering memorandum is unclear; however, a review of those materials would have indicated the numerous business and tax risks associated with an investment. The preface to the offering memorandum warned the potential investor not to consider its contents as expert advice and to seek advice from the investors' own advisers.  The offering memorandum also clearly stated that the transactions involved significant tax risks and that in all likelihood the IRS would challenge the validity of the transactions and the purported value of the recycling machines.  The "business risks" section of the offering memorandum warned that there was no history for Sunbelt and that there was no established market for the recyclers or pellets produced therefrom.  Petitioner failed to carefully consider the offering memorandum and to take into account its warnings.  Statements regarding the business and tax

risks and the warnings placed on the front page of the offering memorandum would have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. T.C. Memo. 1987-217.

Petitioners' contention that they reasonably relied upon Storey's advice is further undermined by petitioner's background in manufacturing. In view of petitioner's success in various manufacturing businesses, we find it difficult to accept the proposition that he did not know or have reason to know that the value of the Sentinel machine was grossly overstated.

In addition, petitioners contend that the investment was reasonable because they expected to make a profit. We find that petitioners' profit motive is not dispositive of the issue here in dispute. Whether or not petitioners intended to profit from their investment in Sunbelt, they failed to exercise due care in claiming tax benefits from that investment. Their subjective intent does not excuse them from the consequences of claiming deductions and credits to which under the circumstances they were clearly not entitled. See Klieger v. Commissioner, T.C. Memo. 1992-734.

We have considered and find unpersuasive petitioners' arguments comparing this case with other cases that were resolved in the taxpayers' favor with respect to the negligence addition to tax.

Petitioners failed to exercise due care in claiming the deductions and tax credits relating to their investment in Sunbelt. We find that they did not reasonably rely upon Storey or in good faith investigate the aspect of the investment that generated the "attractive" tax benefits--the value of the Sentinel recycler. Therefore, we hold that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a) for 1979 and 1980 and section 6653(a)(1) and (a)(2) for 1981 and 1982.

To reflect the foregoing, and to ensure that the Stipulation of Settled Issues is properly taken into account,

<u>Decision will be</u>

<u>entered under Rule 155</u>.