T.C. Memo. 1997-174


UNITED STATES TAX COURT


ESTATE OF ROMINE C. HOGARD, DECEASED, JAMES C. ELLIOTT, PERSONAL
REPRESENTATIVE, AND BILL F. STEWART, PERSONAL REPRESENTATIVE, AND
WANDA L. HOGARD, ET AL.,[1] Petitioners <u>v</u>. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket Nos.  3319-89, 19780-89,          Filed April 8, 1997.
             27132-89, 27225-89.


<u>Paul R. Hodgson</u>, for petitioners.

<u>David G. Hendricks</u> and <u>Osmun R. Latrobe</u>, for respondent.


MEMORANDUM OPINION

DAWSON, <u>Judge</u>:  These consolidated cases were assigned to

Special Trial Judge Lewis R. Carluzzo pursuant to section

7443A(b)(4) and Rules 180, 181, and 183.  All section references

---

[1]Cases of the following petitioners are consolidated
herewith:  Gilmore & Wilson Construction Co. & Subsidiary, docket
No. 19780-89; Charles T. and Bettye Gilmore, docket No. 27132-89;
and Jerry L. Wilson, docket No. 27225-89.

are to the Internal Revenue Code in effect for the years in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.  The Court agrees with and adopts the Special Trial Judge's opinion, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

CARLUZZO, Special Trial Judge:  Respondent determined deficiencies, additions to tax, and increased interest with respect to Romine C. and Wanda L. Hogard's Federal income taxes as follows:

| | | Additions to Tax and Increased Interest | | | | |
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a) | 6653(a)(1) | 6653(a)(2) | 6659 | 6621(c) |
|------|-----------|---------|-----------|-----------|------|---------|
| 1979 | $22,580.00 | $1,129.00 | --- | --- | $6,774.00 | 2 |
| 1980 | 28,358.00 | 1,417.90 | --- | --- | 8,507.40 | 2 |
| 1981 | 28,662.00 | --- | $1,433.10 | 1 | 8,598.60 | 2 |
| 1982 | 15,366.40 | --- | 768.32 | 1 | 4,609.92 | 2 |

1 50 percent of the interest due on the deficiency.

2 Interest on the entire deficiency to be computed at 120 percent of the standard underpayment rate.

Respondent determined deficiencies, additions to tax, and increased interest with respect to Gilmore & Wilson Construction Co. & Subsidiary's Federal income taxes as follows:

| | | Additions to Tax and Increased Interest | | | | |
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| TYE | Deficiency | 6653(a) | 6653(a)(1) | 6653(a)(2) | 6659 | 6621(c) |
|------|-----------|---------|-----------|-----------|------|---------|
| 7/31/80 | $27,845.00 | 1,392.25 | --- | --- | $8,353.50 | 2 |
| 7/31/81 | 10,595.20 | --- | $529.76 | 1 | 3,178.56 | 2 |
| 7/31/83 | --- | --- | 2,149.31 | 1 | 12,895.84 | 2 |

1 50 percent of the interest due on the deficiency.

2 Interest on the entire deficiency to be computed at 120 percent of the standard underpayment rate.

Respondent determined deficiencies, additions to tax, and increased interest with respect to Charles T. and Bettye Gilmore's Federal income taxes as follows:

| | | Additions to Tax and Increased Interest | | | | | |
| Year | Deficiency | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 | Sec. 6621(c) | Sec. 6661(a) |
|------|-----------|---------------|------------------|------------------|-----------|---------------|---------------|
| 1979 | $2,647 | $132 | --- | --- | $794 | 2 | --- |
| 1980 | 12,047 | 602 | --- | --- | 3,614 | 2 | --- |
| 1981 | 6,332 | --- | $317 | 1 | 1,900 | 2 | --- |
| 1982 | 29,649 | --- | 1,482 | 1 | 7,667 | 2 | $1,023 |

1  50 percent of the interest due on the deficiency.

2  Interest on the entire deficiency to be computed at 120 percent of the standard underpayment rate.

Respondent determined deficiencies, additions to tax, and increased interest with respect to Jerry L. Wilson's Federal income taxes as follows:

| | | Additions to Tax and Increased Interest | | | | | |
| Year | Deficiency | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 | Sec. 6621(c) | Sec. 6661(a) |
|------|-----------|---------------|------------------|------------------|-----------|---------------|---------------|
| 1979 | $11,657 | $583 | --- | --- | $3,497 | 2 | --- |
| 1980 | 1,397 | 70 | --- | --- | 419 | 2 | --- |
| 1982 | 49,452 | --- | $2,473 | 1 | 12,180 | 2 | $2,213 |

1  50 percent of the interest due on the deficiency.

2  Interest on the entire deficiency to be computed at 120 percent of the standard underpayment rate.

These cases are part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The underlying transactions involving the Sentinel recyclers in this case are substantially identical to the transactions considered in the Provizer case.

Consistent with the resolution of some of the disputed issues in Provizer, in each of these cases petitioners filed a Stipulation of Settled Issues concerning the adjustments related to their participation in the Plastics Recycling Program.  Each stipulation states:

1.  Petitioners are not entitled to any deductions, losses, investment credits, business energy credits or any other tax benefits claimed on their tax returns for the taxable years in issue as a result of their participation in the Plastics Recycling Program.

2.  The underpayments in income tax attributable to the investment credit and business energy investment credit claimed with respect to petitioners' participation in the Plastics Recycling Program are subject to the addition to tax for valuation overstatements determined under I.R.C. section 6659 using an applicable percentage of 30 percent.

3.  The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. section 6621(c) as set forth in the notice of deficiency.

4.  This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to tax for negligence under the applicable provisions of section 6653(a).

The issue remaining for decision is whether petitioners are liable for the additions to tax for negligence under the relevant provisions of section 6653 for the years in issue.  Although not specifically addressed in the Stipulation of Settled Issues, because neither evidence nor argument was presented on the point by the affected petitioners, we deem those petitioners to have conceded respondent's determinations with respect to the section 6661 addition to tax.  Rule 149(b); Murphy v. Commissioner, 103 T.C. 111, 119 (1994); Rothstein v. Commissioner, 90 T.C. 488, 497 (1988).

Background

Some of the facts have been stipulated, and they are so found. When the petitions were filed in these cases, all of the individual petitioners resided in Tulsa, Oklahoma, which is also the principal place of business of the corporate petitioner. Romine C. Hogard and Bettye Gilmore died after their petitions were filed.

In 1982, Romine C. Hogard (Hogard) was the president and apparently the sole shareholder of a corporation whose business involved coin-operated entertainment machines. He had a high school education. Neither the educational nor employment background of Wanda L. Hogard has been placed in the record. The parties stipulated that she was a "housewife" during 1982.

Charles T. Gilmore (Gilmore) graduated from Oklahoma A&M College in 1952 with a bachelor of science degree in marketing. Gilmore was in the military from 1952 through 1954. From 1954 through 1966, Gilmore worked for Knuckles Construction Co. The record contains no information regarding the educational or employment background of Bettye Gilmore.

Jerry Wilson (Wilson) has a bachelor of science degree from the University of Arkansas. After graduation, he worked for an architect and later became employed by Knuckles Construction Co.

In 1966 Gilmore and Wilson organized the Gilmore & Wilson Construction Co. (G&W), a corporation through which they

conducted a business engaged in the construction of houses and commercial buildings.  Since the formation of G&W, Gilmore has been the office manager and handled its business affairs, and Wilson has been the president and design planner.

Prior to 1982, the Gilmores owned stocks, maintained a savings account, and invested in certificates of deposit.  Prior to 1982, Wilson maintained a savings account and invested in certificates of deposit.  In addition, the Gilmores invested in residential real estate properties that they held for rent, as did Gilmore and Wilson through a partnership.  The investment history of the Hogards is unknown.

When Knuckles Construction Co. experienced accounting problems in 1962, Bill F. Stewart (Stewart), who was a friend of the construction company's owner, was consulted for assistance in resolving the problems.  This is how Stewart met, and later secured as clients, Gilmore and Wilson.

Stewart has a bachelor of science degree in commerce and business administration.  He has taken courses towards a master's degree in accounting and a few law school courses.  Stewart became a certified public accountant in 1947 and began his career as such with a national accounting firm.  In 1951, Stewart started his own accounting business which focused primarily on preparing individual income tax returns and providing tax advice.

Wilson and Gilmore relied on Stewart for accounting and tax assistance in organizing G&W, including establishing the company's record-keeping systems and a profit sharing plan. Stewart also assisted Gilmore and Wilson in the formation of a partnership to acquire and manage certain real estate. G&W's books and records were maintained by Stewart, who typically prepared the corporation's Federal income tax returns, including the returns for the years in issue. G&W's returns were reviewed by Gilmore and Wilson before the returns were filed.

The Hogards became clients of Stewart in the mid-1960's. Details regarding the nature and extent of their relationship or the services that Stewart provided to the Hogards are unclear.

It appears that Stewart, or one of his associates, prepared all of the relevant Federal income tax returns and applications for tentative refunds involved in these cases; however, we note that the record contains only unfiled copies of some of these documents, so our finding on this point is not established. We also note that Exhibit 3-C, which was attached to the stipulation of facts, is a copy of a 1981 individual Federal income tax return for Romine C. Hogard. Unlike the other years in issue, we do not have a copy of a joint Federal income tax return for the Hogards for that year. Nevertheless, the notice of deficiency for the Hogards makes determinations as though they filed a joint return for that year, and the parties have proceeded accordingly.

Neither party has addressed this apparent inconsistency, and we proceed as though Exhibit 3-C was not, in fact, a copy of a return that was actually filed with respondent.

With respect to the preparation of their individual Federal income tax returns, the Gilmores and Wilson accumulated and forwarded the necessary documentation to Stewart. Stewart received the Hogards' tax information from Hogard's secretary. Before the returns were signed and filed, the Gilmores and Wilson reviewed their respective returns. It is unknown whether the Hogards did the same.

In early 1982, Stewart learned about the Clearwater group partnership (Clearwater), Southeast Recovery Associates (Southeast), and Esplanade Associates (Esplanade) through Bill Storey (Storey), who was the accountant of a friend of one of Stewart's clients. Clearwater, Southeast, and Esplanade are limited partnerships which purportedly engaged in licensing Sentinel expanded polyethylene (EPE) recyclers manufactured by Packaging Industries, Inc. (PI), of Hyannis, Massachusetts.

At some point, Stewart reviewed the Clearwater offering memorandum. Stewart later received the offering memoranda for Esplanade and Southeast and was advised that they were similar to the Clearwater offering memorandum. The respective offering memoranda for Southeast and Esplanade allocate 10 percent of the proceeds from each offering to the payment of sales commissions

and offeree representative fees. In addition, the offering memoranda list significant business and tax risks associated with an investment including: (1) A substantial likelihood of an audit by the Internal Revenue Service (IRS) and that the purchase price paid by F&G to ECI would probably be challenged as being in excess of fair market value; (2) that Southeast and Esplanade had no prior operating history; (3) that Samuel Winer, the general partner of southeast and Esplanade, had no prior experience in recycling or similar equipment; (4) that the limited partners had no control over the conduct of Southeast's and Esplanade's business; (5) that there was no established market for the recyclers; (6) that there were no assurances that market prices for virgin resin would remain at their current costs per pound or that the recycled pellets would be as marketable as virgin pellets; and (7) that certain potential conflicts of interest existed. The value of the Sentinel recyclers was grossly overstated in the promotional materials.

Stewart read the marketing opinion of Stanley Ulanoff (Ulanoff), the technical opinion of Samuel Z. Burnstein (Burnstein), and the tax opinion of John Y. Taggart (Taggart). Ulanoff owns a 1.27-percent interest in Plymouth Equipment Associates and a 4.37-percent interest in Taylor Recycling Associates, both of which leased Sentinel recyclers. Burnstein owns a 2.605-percent interest in Empire Associates and a 5.82-

percent interest in Jefferson Recycling Associates, both of which leased Sentinel recyclers. Both Ulanoff and Burnstein's opinions are included in all offering memoranda involving the recyclers. Taggart and other members of the law firm of Windels, Marx, Davies & Ives prepared the offering memorandum, tax opinion, and other legal documents for the initial Plastics Recycling partnership, Clearwater, and 16 other Plastics Recycling partnerships. Taggart was the head of the tax department of Windels, Marx, Davies & Ives and taught tax law as an adjunct professor at New York University (NYU) Law School. Taggart had previously been employed by the U.S. Department of the Treasury and as a full-time faculty member of NYU Law School. Taggart owned a 6.66-percent interest in a second-tier Plastics Recycling partnership.

Samuel L. Winer (Winer) is the general partner of Esplanade and Southeast. Aside from being the general partner of Esplanade and Southeast, Winer is also an investment banker and financial consultant with offices in Clearwater, Florida. He is also the general partner in other plastics recycling limited partnerships including Clearwater, Poly Reclamation Associates, and Sunbelt Partnership Group. For his services to Esplanade and Southeast, Winer received $60,000 from each partnership out of the proceeds of the Esplanade and Southeast private offerings.

PI is a closely held corporation which manufactures thermoplastic and other types of packaging machinery. PI holds itself out as the world's largest manufacturer of blister packaging machinery and as fabricating the industry's widest line of thermoforming machinery including highly specialized disposable medical and food packaging systems. PI also manufactures both the Sentinel EPE and EPS Recyclers, which recycle expanded polyethylene and expanded polystyrene.

Stewart and Storey decided to visit PI's facilities in Hyannis, Massachusetts, to see whether the recyclers performed as described in the offering memorandum. At their own cost, they flew to New York where they met Winer, who provided them with transportation to Hyannis. At PI's facilities, they observed a demonstration of the recyclers and listened to a presentation about the recyclers. Stewart, Storey, and 10 to 12 other people attended a luncheon paid for by PI at which they discussed the investment. During this trip, Stewart was told that the disposal of plastic was expensive, the recycler was unique, the price of the recycler was reasonable, there were no patents on the recycler, and some recyclers had sold for prices in excess of those in the offering memorandum. Other than Winer, Stewart did not recall the names of the individuals with whom he spoke at PI.

The recycler demonstration convinced Stewart that the recycler performed as stated in the offering memorandum.

However, Stewart performed no tests on the quality of its output. He did not know the names of companies who would use the recyclers and did not inquire about the market for scrap pellets or the cash-flow to be generated by the recyclers, pellets, or the investment as a whole.

Storey advised Stewart that he was entitled to a commission in connection with an investment by any of Stewart's clients in Southeast or Esplanade. Storey and Stewart agreed to split the commissions resulting from any subsequent investment by Stewart's clients in Southeast or Esplanade.

Stewart has no detailed knowledge or expertise in plastics recycling, machinery, or materials. Instead, he relied on the individuals associated with Southeast and Esplanade and the authors of the various opinions appended to the offering memoranda to have the necessary expertise with regard to the transactions involved in Southeast and Esplanade.

Stewart advised Gilmore and Wilson about the Clearwater partnership and told them that it was fully subscribed; however, he also informed them of the opportunity to invest in Southeast and/or Esplanade. Prior to investing in Southeast, Gilmore and Wilson met with Stewart several times. It is unclear whether Gilmore and Wilson attended these meetings separately. During these meetings, the energy crisis, the price of oil, and the benefits of recycling plastic were discussed. Stewart described

his visit to PI, the demonstration of the recycler, and his discussions with various individuals at PI. Stewart advised them that the operation looked viable because it solved the problem of plastic disposal, because the recyclers could be used by companies which did not have to purchase the recyclers, and because of the effect of rising oil prices on the plastics industry. The tax benefits of the investment were also discussed. Stewart informed Gilmore and Wilson that he intended to make an investment in one of the partnerships, and subsequently did so. Gilmore and Wilson were aware that Stewart had no background in plastics recycling, machinery, or materials.

Stewart provided Gilmore and Wilson with Southeast's offering memorandum. Although Gilmore reviewed the offering memorandum, he did not read it "cover to cover". Gilmore read Ulanoff's marketing report and Taggart's tax opinion, and he was impressed with their credentials. Gilmore made no independent investigation of the projections in the offering memorandum. Gilmore did not know the value of the recyclers and was unfamiliar with nonrecourse notes.

Wilson looked at the offering memorandum and attempted to understand it to "the best of his ability", although the extent of his review of the offering memorandum is unclear. Wilson was not concerned by the warnings on the front page of the offering memorandum, the conflicts of interest described therein, or the

fact that Southeast had no operating history.  Wilson did not seek another opinion regarding the investment, the recycler, or the transactions involved in the investment.

The Gilmores, Wilson, and G&W each invested $25,000 in Southeast for a 2.91-percent interest in Southeast.  Stewart was entitled to commissions related to the Gilmores', Wilson's, and G&W's investments in Southeast.  Gilmore and Wilson were aware of Stewart's commission arrangements with the promoters of Southeast.

Stewart apparently introduced the Hogards to the Esplanade investment; however, the events leading to their decision to invest in Esplanade are unknown.  In February 1982, the Hogards invested $50,000 in Esplanade for 5.82-percent interest in the profits, losses, and capital of Esplanade.

After the investments, Stewart had some contact with Winer, and he received letters regarding the recyclers.  The substance or extent of any direct contacts among the Gilmores, Wilson, G&W, the Hogards, and Winer, or any other individual associated with Southeast, is unknown.

From 1979 through 1981, the Gilmores' average adjusted gross income was $70,488.  In 1982 their adjusted gross income increased substantially to $220,713 due to a gain realized on the disposition of a capital asset.  On their 1982 return, they claimed investment tax credits of $43,042 and carried back

credits of $21,176 to 1979, $18,479 to 1980, and $6,332 to 1981. These credits resulted from their investment in Southeast. They did not claim any losses with respect to Southeast on any of these returns.

From 1979 through 1980, Wilson's average adjusted gross income was $82,444. In 1982, his adjusted gross income increased substantially to $231,282 due to a gain realized on the disposition of a capital asset. On his 1982 return, he claimed investment tax credits of $43,042 and carried back credits of $13,054 to 1979 and $881 to 1980. The credits resulted from his investment in Southeast. Wilson did not claim any losses with respect to Southeast on any of these returns.

On its 1983 return, G&W claimed a loss of $20,452 related to Southeast. G&W also carried back investment tax credits of $4,472 to 1980 and $10,514 to 1981. These credits resulted from G&W's investment in Southeast.

On their 1982 return, the Hogards claimed a loss of $40,884 and investment tax credits of $81,200, which items related to their investment in Esplanade. They used $1,600 of the credits in 1982 and carried back investment tax credits of $22,580 to 1979, $28,358 to 1980, and $28,662 to 1981.

With respect to each petitioner, in the applicable notice of deficiency, respondent disallowed all items of income, loss, deductions, and credits attributable to Southeast or Esplanade.

Respondent also disallowed all of the investment tax credit carrybacks claimed by petitioners.  Respondent also determined that petitioners were liable for additions to tax as set forth in the opening paragraphs of this opinion and that the increased rate of interest under section 6621(c) was applicable to each year in issue.

Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, T.C. Memo. 1992-177, with the exception of certain facts concerning the Provizers, the expert opinions, and other matters that we consider of minimal significance.

Those facts may be summarized as follows.  In 1981, PI manufactured and sold six Sentinel EPE Recyclers to ECI Corp. for $981,000 each.  ECI Corp., in turn, resold the recyclers to F&G Corp. for $1,162,666 each.  F&G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI.  The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes.  Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F&G Corp. was paid in cash with the remainder financed through notes.  These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in

these transactions offset each other and were made simultaneously. Although the recyclers were sold and leased under the structure of simultaneous transactions, the fair market value of a Sentinel EPE Recycler in 1981 was not in excess of $50,000, and the nuts and bolts, or manufacturing cost, was $18,000. Other recycling machines were commercially available during the years in issue including the Buss-Condux Plastcompactor, Nelmor/Weiss Densification System (Regenolux), Cumberland Granulators, and Foremost Densilator.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, Southeast and Esplanade leased Sentinel EPE Recyclers from F&G Corp. and licensed those recyclers to FMEC Corp. The transactions of Southeast and Esplanade differ from the underlying transactions in Provizer v. Commissioner, supra, in the following respects: (1) The entity that leased the machines from F&G Corp. and licensed them to FMEC Corp; and (2) the number of machines sold, leased, licensed, and sublicensed.

In Provizer v. Commissioner, supra, a test case for the Plastics Recycling group of cases, this Court found that each Sentinel EPE recycler had a fair market value not in excess of

$50,000; (2) held that the transaction, which is almost identical to the transactions in this case, was a sham because it lacked economic substance and a business purpose; (3) upheld the section 6653(a)(1) and (2) additions to tax for negligence; (4) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers; and (5) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Since our opinion in Provizer v. Commissioner, supra, we have decided numerous Plastics Recycling cases and, with one exception, have found the taxpayers liable for the addition to tax under section 6653(a). See Friedman v. Commissioner, T.C. Memo. 1996-558, and cases cited therein; see also Henry v. Commissioner, T.C. Memo. 1997-86; Skyrms v. Commissioner, T.C. Memo. 1997-69. Set against this background, we consider whether the addition to tax for negligence should be imposed on any petitioners.

## Discussion

Section 6653(a) for 1979 and 1980 and section 6653(a)(1) for 1981, 1982, and 1983 impose an addition to tax equal to 5 percent of the underpayment if any part of any underpayment in tax is due to negligence or disregard of rules or regulations. Section 6653(a)(2) for 1981, 1982, and 1983 imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or disregard of rules or regulations. Petitioners bear the burden of proving that any underpayment was not due to negligence. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his or her experience and the nature of the investment or business. Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare Spears v. Commissioner, T.C. Memo. 1996-341 with Zidanich v. Commissioner, T.C. Memo. 1995-382.

Petitioners contend that they were not negligent because they reasonably relied in good faith upon the advice of a qualified, independent adviser, to whom they made full disclosure. In addition, petitioners contend that they were not negligent because they reasonably expected to make a profit from their investment in Southeast or Esplanade. Respondent, on the other hand, contends that petitioners were negligent because their reliance on Stewart was not reasonable and they failed to adequately or reasonably investigate the validity of the underlying transactions or the value of the recyclers involved with their investments.

Turning our attention first to the Hogards, we note that the record contains no evidence that they, or either of them, relied upon the advice of Stewart, or any other adviser. Respondent's determination that they are liable for the addition to tax under section 6653(a) is presumptively correct, and the burden is upon the Hogards to prove otherwise. Rule 142(a); Neely v. Commissioner, supra; Bixby v. Commissioner, supra. This they have failed to do. Accordingly, respondent's determinations are sustained with respect to the Hogards.

As for the Gilmores, Wilson, and G&W, under some circumstances a taxpayer may avoid liability for the additions to tax under section 6653(a) if reasonable reliance on a competent professional adviser is shown. United States v. Boyle, 469 U.S.

241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  Freytag v. Commissioner, supra.  For reliance on professional advice to excuse a taxpayer from the negligence addition to tax, the taxpayer must show that the professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  Goldman v. Commissioner, supra; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991).  Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture.  Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985).

Southeast's offering memorandum contains a description of various business and tax risks associated with an investment. Despite a review of the offering memorandum, Stewart made no effort to verify the information contained in the offering memorandum beyond visiting PI's facilities and discussing the investment with unknown individuals at PI.  While Stewart claims to have discussed the investment with fellow C.P.A.'s, the substance and details surrounding any purported discussions are unclear, and there is no indication that these C.P.A.'s had any background or experience in the plastics industry.  Despite his lack of knowledge regarding the recycler, the target market for the recycler, and the technical aspects of the transactions, Stewart did not contact an expert in plastics recycling or engineering or recommend that the Gilmores, Wilson, or G&W do so.

Although Stewart visited the PI plant in Hyannis and observed a demonstration of the recycler, he was not qualified to analyze or assess the recyclers on display or the facility. Stewart made no adequate investigation into the value of the recycler, although an investigation would have revealed the existence of other plastics recycling machines available in 1981 and 1982 ranging in price from $20,000 to $200,000.  See Provizer v. Commissioner, T.C. Memo. 1992-177.  Despite his lack of special qualifications and professional skills in plastics engineering, recycling, or materials, Stewart made no effort to

contact or consult with anyone who possessed such qualifications. Given Stewart's background and experience, he undoubtedly was aware that the tax benefits outlined in the offering memorandum and claimed by petitioners depended in large part on the value of the recycling machines. Nevertheless, having no knowledge or background regarding the value of the recyclers, he did nothing sufficient to verify the representations made in the promotional materials and by individuals associated with the promotion. As we view the matter, Stewart's trip to inspect the recyclers was essentially superficial. In effect, he relied not upon the information he gathered through his own investigation, but upon representations made by Southeast's promotional materials and promoters.

Taking the above into consideration, the Gilmores', Wilson's and G&W's (through Gilmore and Wilson) reliance upon Stewart was not reasonable. A taxpayer may rely upon his adviser's expertise, in this case financial planning and tax advice, but it is not reasonable to rely upon an adviser regarding matters outside his field of expertise or with respect to facts which he does not verify, in this case the value of the recycler. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987).

Moreover, Stewart was not an independent adviser since he was entitled to receive compensation from Southeast for the

Gilmores', Wilson's, and G&W's investments in Southeast. Because Stewart was paid to sell the investment, his advice was suspect.

The Gilmores, Wilson, and G&W (through Gilmore and Wilson) contend that they reviewed Southeast's offering memorandum. The extent of their review of the offering memorandum is unclear; however, a review of that document would have indicated the numerous business and tax risks associated with an investment. The preface to the offering memorandum warned the potential investor not to consider its contents as expert advice and to seek advice from the investor's own advisers. The offering memorandum also clearly stated that the transactions involved significant tax risks and that in all likelihood the IRS would challenge the validity of the transactions and the purported value of the recycling machines. The "business risks" section of the offering memorandum warned that there was no history for Southeast and that there was no established market for the recyclers or pellets produced therefrom. The Gilmores, Wilson, and G&W failed to carefully consider the offering memorandum and to take into account its warnings. Statements regarding the business and tax risks and the warnings placed on the front page of the offering memorandum would have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits. See Collins v. Commissioner, 857 F.2d

1383, 1386 (9th Cir. 1988), affg. <u>Dister v. Commissioner</u>, T.C. Memo. 1987-217.

The Gilmores', Wilson's, and G&W's contention that they reasonably relied upon Stewart's advice is further undermined by their successful business backgrounds. In view of their success in the construction business and profitable real estate investments, we find it difficult to accept the proposition that they did not know or have reason to know that the value of the recyclers was grossly overstated. We find it more likely than not that they were so interested in the expected tax benefits that would result from the investment that they failed to investigate and seek advice on the underlying transactions that were to generate those tax benefits. Our conclusion on this point is supported by the fact that the Gilmores' and Wilson's investments in Southeast, which were not consistent with their prior investment histories, occurred in a year that capital transactions were expected to, and did, generate large capital gains.

The Gilmores, Wilson, and G&W also contend that the investment was reasonable because they expected to make a profit. We have severe reservations about the validity of their claims on this point; however, even if true, their profit motives are not dispositive of the issue here in dispute. Whether or not they intended to profit from their investments in Southeast, they

failed to exercise due care in claiming tax benefits from that investment. Their subjective intent does not excuse them from the consequences of claiming deductions and credits to which under the circumstances they were clearly not entitled. See Klieger v. Commissioner, T.C. Memo. 1992-734.

We have considered and find unpersuasive petitioners' arguments comparing this case with other cases that were resolved in the taxpayers' favor with respect to the negligence addition to tax.

The Gilmores, Wilson, and G&W failed to exercise due care in claiming the deductions and tax credits relating to their respective investments in Southeast. We find that they did not reasonably rely upon Stewart or in good faith investigate the aspect of the investment that generated the "attractive" tax benefits--the value of the Sentinel recycler. Therefore, we hold that these petitioners and the Hogards are liable for the negligence additions to tax under the provisions of section 6653(a) for 1979 and 1980 and section 6653(a)(1) and (2) for 1981, 1982, and 1983.

To reflect the foregoing, and to ensure that each of the Stipulations of Settled Issues is properly taken into account,

<u>Decisions will be entered under Rule 155</u>.