**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 13 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

GILMORE & WILSON
CONSTRUCTION COMPANY AND
SUBSIDIARY,

        Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE,

        Respondent-Appellee.

_____

JERRY L. WILSON,

        Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE,

        Respondent-Appellee.

_____

CHARLES T. GILMORE and
BETTYE GILMORE,

        Petitioners-Appellants,

v.

No. 97-9024
Appeal from U.S. Tax Court
(T.C. No. 19780-89)

No. 97-9026
Appeal from U.S. Tax Court
(T.C. No. 27225-89)

No. 97-9027
Appeal from U.S. Tax Court
(T.C. No. 27132-89)

COMMISSIONER OF INTERNAL
REVENUE,

      Respondent-Appellee.

---

**ORDER AND JUDGMENT** *

---

Before **BRORBY** , **BRISCOE** , and **LUCERO** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined

unanimously to grant the parties' request for a decision on the briefs without oral

argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). These cases are

therefore ordered submitted without oral argument.

These three appeals challenge the Tax Court's affirmance of the

Commissioner's imposition of penalties and interest due to the taxpayers-

appellants' negligent underpayment of taxes owed for various tax years from 1979

to 1983. *See Estate of Hogard v. Commissioner* , 73 T.C.M. (CCH) 2552, 1997

---

\*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

WL 160769 (1997). [1] We have jurisdiction pursuant to 26 U.S.C. § 7482(a) and affirm.

## I.

These cases are part of what the Commissioner refers to as the "plastics recycling" group of cases, which involve limited partnership tax shelters that claimed tax benefits relating to machines designed to recycle plastic scrap. A detailed discussion of the transactions involved in the plastics recycling cases is contained in *Provizer v. Commissioner*, 63 T.C.M. (CCH) 2531, 1992 WL 56983 (1992), *aff'd*, No. 92-1827, 1993 WL 245799 (6th Cir. 1993). In affirming the Tax Court's decision in *Provizer*, the Sixth Circuit briefly summarized the circular transactions involved as follows:

> In 1981, a corporation called Packaging Industries, Inc. manufactured and sold six Sentinel EPE Recyclers to ECI Corporation for $5,886,000 ($981,000 each) which in turn resold the recyclers to F & G Corporation for $6,976,000 ($1,162,666 each). F & G leased the recyclers to a limited partnership called Clearwater Group, and Clearwater then licensed the recyclers to FMEC Corporation, which sublicensed them back to Packaging Industries. These transactions were structured in such a way that all of the payments between the entities offset each other. Packaging Industries then allegedly sublicensed the recyclers to entities who would use them to recycle plastic scrap.

---

[1] The Tax Court consolidated the cases of the Hogard estate and appellants. The Hogard estate did not appeal. Although appellants each filed separate briefs, they raise the same issues, and with only minor variations in facts, the briefs are virtually identical. We therefore have combined the three appeals for disposition.

*Provizer*, 1993 WL 245799 at **1.

The underlying transactions in these cases are essentially identical to those in *Provizer* except that the limited partnership involved was Southeast Recycling Associates rather than the Clearwater Group. [2] The taxpayers-appellants here-- Charles and Bettye Gilmore, Jerry Wilson, and Gilmore & Wilson Construction Company (G&W), a company owned and managed by Charles Gilmore and Wilson (collectively, "taxpayers")--each invested $25,000 in Southeast in 1982. The tax effects of these investments were as follows: In 1982, the Gilmores claimed investment tax credits of $43,042, and carried back credits of $21,176 to 1979, $18,479 to 1980, and $6,332 to 1981. On Wilson's 1982 return, he claimed investment tax credits of $43,042. He also carried back credits of $13,054 to 1979 and $881 to 1980. G&W claimed a tax loss on its 1983 return of $20,452 and carried back tax credits of $4,472 to 1980 and $10,514 to 1981. All told, on the total $75,000 invested, taxpayers took tax credits of $160,992 and losses of $20,452; they did not report any income from their investments in Southeast.

The Tax Court in *Provizer* determined that the transactions involving the Sentinel recyclers were tax shams lacking economic substance and business

[2]     There apparently were a number of different limited partnerships formed to play roles similar to those of Clearwater and Southeast in other series of transactions, thus creating more opportunities for investors. Taxpayers invested in Southeast because Clearwater had already been fully subscribed.

purpose. *See Provizer* , 1992 WL 56983, at 17-23. The court's determination was due in large part to its finding that the recyclers' fair market value, an amount critical to the size of any tax benefits, was no more than $50,000 each, rather than the $1,162,666 on which the tax benefits were based. *See id.* at 15. As a result of the decision in *Provizer* , the Commissioner determined deficiencies, additions to tax and increased tax pursuant to I.R.C. §§ 6659, 6621(c) and 6653 with respect to the taxpayers' claimed tax benefits relating to their investments in Southeast. Taxpayers each filed separate suits in the Tax Court challenging the Commissioner's determinations. Taxpayers eventually stipulated substantially to the facts found in *Provizer* and, as a result, further stipulated that

> 1. [Taxpayers] are not entitled to any deductions, losses, investment credits, business energy credits or any other tax benefits claimed on their tax returns for the taxable years in issue as a result of their participation in the Plastics Recycling Program.
>
> 2. The underpayments in income tax attributable to the investment credit and business energy investment credit claimed with respect to [taxpayers'] participation in the Plastics Recycling Program are subject to the addition to tax for valuation overstatements determined under I.R.C. section 6659 using an applicable percentage of 30 percent.
>
> 3. The underpayments in income tax attributable to [taxpayers'] participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. section 6621(c) as set forth in the notice of deficiency.

*Estate of Hogard*, 1997 WL 160769, at 9. The only remaining issue was whether taxpayers were liable for the additions to tax for negligence under § 6653 for the years in question.

Section 6653, as applicable to the period in question, provides for imposition of an addition to tax of five percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. [3] "For purposes of section 6653, 'negligence' is lack of due care or failure to do what a reasonable and prudent person would do under similar circumstances." *Anderson v. Commissioner*, 62 F.3d 1266, 1271 (10th Cir. 1995). Because the Commissioner did not assert that their tax treatment of their investments would have been improper had Southeast's business not been a sham, taxpayers' negligence, if any, must have been due to their failure to discover that the recycler transactions were a sham. *See id*. Because the Commissioner's determination of negligence is presumed to be correct, taxpayers have the burden of proving they were not negligent. *See id.* Following consolidation of the cases and a trial, the Tax Court concluded that taxpayers had failed to meet their burden. Its findings in this regard may be summarized as follows.

---

[3] Beginning in 1981, § 6653 also provided for an additional interest penalty for negligent underpayment.

Charles Gilmore and Wilson organized G&W in 1966. Bill Stewart, a certified public accountant, provided tax and accounting advice to Gilmore, Wilson and G&W from at least 1966 to the time of trial. In 1982, Stewart learned about the Southeast and related plastics recycling limited partnerships and obtained an offering memorandum. The offering memorandum noted a variety of business and tax risks associated with investing in the partnership including (1) a substantial likelihood of an audit by the Commissioner that would include a challenge to the value of the recyclers as being in excess of fair market value; (2) Southeast's lack of an operating history; (3) the general partner's lack of experience with recycling or similar equipment; (4) the absence of an established market for the recyclers; (5) no assurances as to the marketability or market price for recycled materials; and (6) the existence of potential conflicts of interest. The offering memorandum included favorable marketing, technical and tax opinions from people with experience in the relevant fields. [4]

Stewart traveled to Packaging Industries' plant in Hyannis, Massachusetts, observed a demonstration of the recyclers, and listened to a presentation about them. Stewart did not have any knowledge or experience in plastics recycling,

---

[4]    The Tax Court also noted that the individuals providing these opinions had ownership interests in various related plastics recycling limited partnerships, but it does not appear that this information was disclosed in the offering memorandum.

machinery or materials, and he relied on this presentation and the opinions contained in the offering memorandum for technical expertise in concluding that the operations looked viable. Stewart was informed that he would be entitled to a commission if any of his clients invested in Southeast.

Stewart advised Gilmore and Wilson about investing in Southeast, indicating that the business appeared to be viable and discussing the tax benefits. He told Gilmore and Wilson that he planned to invest in one of the partnerships, and he eventually did. Gilmore and Wilson read parts of the offering memorandum but did not seek further information about the investment, recyclers or transactions before deciding to invest in Southeast.

The Tax Court concluded that taxpayers' underpayment of tax was due to their negligent failure to adequately investigate the validity of the transactions. This determination was based primarily on its conclusion that their reliance on Stewart was unreasonable. The court noted that despite the offering memorandum's description of various business and tax risks and Stewart's lack of knowledge regarding the technical aspects of the business, he did not contact any experts in plastics recycling or recommend that taxpayers do so. He did not investigate the value placed on the recycler, although, the court found, an adequate investigation would have disclosed the availability of other recyclers on the market ranging in price from $20,000 to $200,000. It concluded that Stewart,

in effect, simply relied on the representations made by Southeast's promoters and promotional materials. Because the investment was outside his area of expertise--financial planning and tax advice--the court found that reliance on his advice was unreasonable. The court also found Stewart's advice suspect because he would receive a commission from taxpayers' investments and therefore was not an independent advisor.

The court also found that because the front page of the offering memorandum contained a statement regarding the risks of the investment and Gilmore and Wilson admitted they reviewed the memorandum to some extent, they were negligent for failing to heed the warnings and further investigate. The memorandum explained that it was likely the Commissioner would challenge the validity of the transactions and the values placed on the recyclers. The court also found that in light of Gilmore and Wilson's successful business backgrounds--i.e., their profitable construction business and real estate investments--they knew or should have known that the value of the recyclers were overstated. Further, the court found

> it more likely than not that they were so interested in the expected tax benefits that would result from the investment that they failed to investigate and seek advice on the underlying transactions that were to generate those tax benefits. Our conclusion on this point is supported by the fact that the Gilmores' and Wilson's investments in Southeast, which were not consistent with their prior investment histories, occurred in a year that capital transactions were expected to, and did, generate large capital gains.

*Estate of Hogard* , 1997 WL 160769, at 15. Finally, the court found that while it had "severe reservations" about the validity of taxpayers' claims that they expected to make a profit on the investment, their profit motives, even if true, would not be dispositive because it would not excuse them from claiming benefits to which they clearly were not entitled. The court therefore concluded that taxpayers did not meet their burden of showing that they were not negligent in failing to discover that the recycler transactions were a sham, and it upheld the imposition of the negligence penalties. Taxpayers appeal.

## II.

The historical facts in this case are largely undisputed. In similar circumstances involving a challenge to negligence penalties, we have explained our standard of review as follows:

> We review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). We review the Tax Court's factual findings under the clearly erroneous standard and review its legal conclusions de novo. *Worden v. Commissioner* , 2 F.3d 359, 361 (10th Cir. 1993). We review mixed questions of law and fact either under the clearly erroneous standard or de novo, depending on whether the mixed question is primarily factual or legal. *Armstrong v. Commissioner* , 15 F.3d 970, 973 (10th Cir. 1994). Here, the underlying facts . . . are, for the most part, undisputed. The parties primarily dispute the conclusions the Tax Court drew from the facts. Where, as here, "'the sole issue is whether the law applied to the facts satisfied the statutory standard,'" we review the Tax Court's application of the law to the facts de novo, since we "'are equally as able as the tax court to draw conclusions from the undisputed facts

-10-

presented.'"  *See National Collegiate Athletic Ass'n v. Commissioner* , 914  F.2d 1417, 1420 (10th Cir.1990) (citations omitted).  *See also  First Nat'l  Bank v. Commissioner*   , 921 F.2d 1081, 1086 (10th Cir.1990) (findings of ultimate fact derived from applying legal principles to subsidiary facts are subject to de novo review).

*Anderson* , 62 F.3d at 1270 (footnote omitted).  We note that this standard seems to differ from the one used by other circuits in analyzing a challenge to a negligence penalty.  Other circuits appear to apply a clearly erroneous standard of review to the ultimate question of negligence regardless of whether the underlying facts are disputed.   *See, e.g.* , *Sacks v. Commissioner*  , 82 F.3d 918, 920 (9th Cir. 1996);  *Durrett v. Commissioner*   , 71 F.3d 515, 517 (5th Cir. 1996);    *Goldman v. Commissioner*  , 39 F.3d 402, 406 (2d Cir. 1994);    *Illes v. Commissioner*   , 982 F.2d 163, 166 (6th Cir. 1992).  Although in his response briefs, the Commissioner notes that the general rule is that a finding of negligence under § 6653 is reviewed for clear error, he does acknowledge the above holding from        *Anderson* . The Commissioner does not argue that     *Anderson*  is wrong or ask that it be overruled, which would require en banc consideration,       *see Starzynski v. Sequoia Forest Indus.*  , 72 F.3d 816, 819 (10th Cir. 1995).  We therefore apply the de novo standard required by   *Anderson*  to the generally undisputed facts in this case.

Taxpayers first argue that the Tax Court misinterpreted the burden of proof and the effect of the presumption that the Commissioner's determination of negligence is correct.  They acknowledge that they have the burden of proving

that they were not negligent. They contend, however, that because they put on evidence indicating that they were not negligent, the presumption disappeared, and the Commissioner was obligated to present evidence showing that a reasonable investor in 1982 would have discovered that the Southeast transactions were a sham. Because they contend that the Commissioner failed to do so, they argue that the Tax Court effectively upheld the Commissioner's decision by relying improperly on the presumption.

The cases on which taxpayers rely involve situations in which the matters at issue were questions of historical fact on which the taxpayers presented evidence in their favor but which the Commissioner failed to rebut with any evidence of his own. *See Moretti v. Commissioner*, 77 F.3d 637, 643-44 (2d Cir. 1996); *Estate of DeNiro v. Commissioner*, 795 F.2d 582, 584-85 (6th Cir. 1986); *Demkowicz v. Commissioner*, 551 F.2d 929, 931-32 (3d Cir. 1977). The courts thus held that it was improper for the Tax Court to have concluded that the taxpayers failed to overcome the presumption in light of the uncontradicted, competent and relevant evidence they presented. That is not the situation the Tax Court faced here. The evidence introduced, both at trial and through stipulation, presents a close question regarding whether taxpayers were negligent. We see no indication in the Tax Court's decision that it relied on any presumption. It simply evaluated the evidence and concluded that taxpayers had not met their burden. We thus

conclude the court did not err procedurally in its assessment of the evidence and turn to its substantive determination that taxpayers were negligent.

Whether taxpayers were negligent depends on whether they exercised due care and performed a reasonable investigation into the validity of the recycler transactions before investing in Southeast. *See Anderson*, 62 F.3d at 1271. They contend that they exercised due care by relying on the reasonable investigation performed by Stewart, and alternatively, because even if Stewart's investigation was not reasonable, they were not negligent in relying on his advice.

Moderate-income investors, such as taxpayers here, do not have to investigate their investments themselves, but may rely on the appropriate advice of financial advisors and accountants. *See Anderson*, 62 F.3d at 1271; *Mauerman v. Commissioner*, 22 F.3d 1001, 1006 (10th Cir. 1994); *Heasley v. Commissioner*, 902 F.2d 380, 383 (5th Cir. 1990). Reliance on such advisors, however, must be objectively reasonable and justifiable; that is, the advice must fall at least generally within the advisors' areas of expertise, and the advisors must be independent of the investment. *See, e.g.*, *United States v. Boyle*, 469 U.S. 241, 251 (1985) (noting taxpayer's reliance on advice of accountant or attorney on matter of tax law reasonable, as "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or attorney"); *Freytag v. Commissioner*, 904 F.2d 1011, 1016 (5th Cir. 1990) (finding reliance on advice of

-13-

lawyers, accountants, and financial consultants referred to as "finders" unreasonable where finders had no expertise in financial aspects of investments involved); *Goldman*, 39 F.3d at 408 (finding taxpayers' reliance on accountant who was also sales representative for investment unreasonable because of inherent conflict of interest); *Pasternak v. Commissioner*, 990 F.2d 893, 903 (6th Cir. 1993) (finding reliance on promoters or their agents unreasonable, as "[a]dvice of such persons can hardly be described as that of 'independent professionals'"). The relative sophistication of the taxpayers is also a consideration in determining whether their reliance was reasonable. *See, e.g., Heasley*, 902 F.2d at 384.

Had Stewart performed a reasonable investigation, taxpayers would have been able to rely on his advice. But we agree with the Tax Court that he did not. To his credit, he did visit the plant where the recyclers were manufactured and observed a several minute demonstration of a prototype. In this respect, he did more than the negligent taxpayer in *Anderson*, who failed to verify the existence of the cargo containers he was supposedly purchasing. *See Anderson*, 62 F.3d at 1272-73. Yet beyond that, as the Tax Court found, Stewart did virtually nothing more than rely on the representations of the promoters and offering materials. Critically, the offering memorandum warned that the Commissioner would likely challenge the value placed on the recyclers in the transactions, which lacked any

-14-

market controls.  Even though the tax benefits were directly tied to this value, Stewart did nothing to determine whether it was reasonable.  Additionally, although Stewart testified that he expected the investments to return a profit, he did nothing to investigate the likelihood of a profit despite the offering memorandum's warnings regarding Southeast's lack of an operating history and absence of an established market for recyclers and recycled materials.  Taxpayers therefore cannot rely on Stewart's investigation to show they exercised due care before investing in Southeast.

Alternatively, taxpayers argue that regardless of whether Stewart in fact performed a reasonable investigation here, they were entitled to rely on his advice regarding the investment in Southeast and the economic validity of the transactions because he was their long-time, trusted advisor.  Considering their relatively modest investments of $25,000 each, taxpayers contend they should not be expected to have extensively or independently investigated the validity of the Southeast transactions.  In support of this position, they point to the Fifth Circuit's concern that "[i]f we require moderate-income investors to independently investigate their investments, the start-up investigation costs may prevent them from investing at all.  If the costs do not prohibit entry, these investors still may not invest because the investigation costs may far exceed their potential profit."  *Heasley*, 902 F.2d at 383-84.  Further, they contend that the Tax

Court's conclusion that their reliance on Stewart's advice was unreasonable because he was advising on matters outside his area of expertise is inconsistent with the law of this circuit, because in *Anderson*, we held that "one does not have to be an expert in an industry before he can invest in the industry himself or recommend an investment to another." 62 F.3d at 1271.

We agree with taxpayers that, to the extent the Tax Court found their reliance on Stewart's advice unreasonable because he was not an expert in the plastics recycling industry, that finding is inconsistent with *Anderson*.[5] And we also agree that taxpayers generally need not monitor the efforts of their advisors

[5] The statement in *Anderson* that advisors do not have to be experts in particular industries was in response to the Commissioner's argument that reliance on the advisor in that case was unreasonable because the advisor lacked knowledge and experience in the particular industry in which the investment was made. The Tax Court here cited cases from the Second Circuit consistent with the argument we rejected in *Anderson*. *See David v. Commissioner*, 43 F.3d 788, 789-90 (2d Cir. 1995); *Goldman*, 39 F.3d at 408.

We also reject another of the reasons the Tax Court gave for finding taxpayers' reliance on Stewart's advice to be unreasonable--the fact that he was entitled to receive compensation from Southeast for taxpayers' investments, thus making his advice not independent. We agree with taxpayers that this fact does not make their reliance on that advice per se unreasonable. Taxpayers had long relied on Stewart for tax and accounting advice, and he had a good reputation in the community. Moreover, he was not affiliated with Southeast or any of the other recycling partnerships other than through his personal investment in one of them. As we found in *Anderson* in similar circumstances, 62 F.3d at 1271, the mere fact that Stewart received compensation for taxpayers' reliance on his advice does not turn him into a promoter whose advice cannot be considered independent.

-16-

when their advisors are acting within their areas of expertise.  But we disagree that *Anderson* supports taxpayers' reliance on Stewart here.  The advisor in *Anderson* was the taxpayer's investment advisor, and he advised the taxpayer regarding the soundness of his investment.    *See* 62 F.3d at 1268.  In contrast, Stewart was not the taxpayers' investment advisor, but their tax accountant who had also provided some accounting advice.  There is no indication in the record that he had previously provided taxpayers advice on investments generally or investments designed to shelter income from taxes, nor that he had experience and knowledge in such areas as assessing the economic substance of tax shelters.

Southeast's offering memorandum advertised tax credits of $77,000 and deductions of $38,940, all in the first year of an investment of $50,000.  It explained the circularity of the sale, leasing and licensing transactions that involved virtually no net cash outlays by any of the parties to the transactions.  The memorandum was replete with warnings regarding the risks involved.  Anyone reading the offering memorandum would be placed on guard that the deal might just be too good to be true.

The due care that taxpayers were obliged to exercise here was not to inquire into the reasonableness of the tax aspects of the investment per se, but to inquire into the economic substance of the investment.  As we noted, the red flags raised by the offering memorandum were obvious to anyone--especially college-

-17-

educated, successful businessmen like Gilmore and Wilson. In this regard, Stewart's position as their tax advisor did not sufficiently differentiate him from Gilmore and Wilson on a knowledge and experience basis such that taxpayers could rely on his advice without further inquiry. *See Leuhsler v. Commissioner*, 963 F.2d 907, 910 (6th Cir. 1992) (finding taxpayer's reliance on advisors, who were fellow accountants, lacking knowledge and experience significantly greater than taxpayer's unreasonable); *Illes*, 982 F.2d at 166 (noting importance of taxpayer's education and business experience in determining whether reliance on advisor reasonable); *Heasley*, 902 F.2d at 383-84. Thus, Stewart's lack of experience in the plastics recycling industry, the Tax Court's reason for finding his advice suspect, is not itself dispositive. But that fact combines with his general lack of knowledge and experience in the area of inquiry to convince us that taxpayers' reliance on Stewart's advice merely because of his position as their long-time tax advisor was not justified in this situation. [6]

---

[6] We also disagree with taxpayers' contention that an investigation into the economic substance of the transactions would have been prohibitively expensive. One of the critical risks identified by the offering memorandum was the possible overvaluation of the recyclers, and a reasonable investigation here could have checked into the value placed on them without undue cost. Taxpayers have stipulated that trade publications at the time advertised other plastics recyclers for less than one-fifth the cost.

As we noted, Gilmore and Wilson were successful businessmen. Prior to investing in Southeast, they had only conservatively invested in stocks and real estate. In 1982, the year they invested in Southeast, their adjusted gross income more than doubled over prior years due to their disposal of a capital asset. Southeast's offering memorandum advertised tax benefits that allowed them to recoup more than their total investment in the first year. Though not all comparable investments may be too good to be true, such lucrative benefits must place any potential investor on guard. We conclude that taxpayers were not adequately on guard and did not undertake a reasonable investigation before

investing in what turned out to be a tax sham. The Commissioner correctly assessed the negligence penalties.

AFFIRMED.


Entered for the Court


Wade Brorby
Circuit Judge